Will the attorneys who are going to orally argue please come up to the podium and identify yourselves. Your Honors, for the appellant, my name is Chris Cronson. Good morning. Josh Vinson on behalf of the defendant at Beli, American Economy Insurance. Very good. Both of you have 15 minutes to present your oral argument. Appellant, please reserve from that 15 minutes whatever portion of time you would like for rebuttal. You may proceed. Thank you, Your Honor. If it pleases the Court, I'd like to begin by comparing the policy language that we have here with the policy language regarding set-off from the Seltzer case. The policy language in Seltzer says that amounts payable for damages under underinsured motorist coverage will be reduced by all amounts payable under any workers' compensation, disability benefits, or similar law. And the Supreme Court in that decision characterized that language as being clear, concise, so it's straightforward policy language. I want to compare that with the policy language that we have in the American Economy policy, which we suggest to the Court is the opposite, is not clear and unequivocal. The policy, and I'm paraphrasing the policy language in American Economy here, it states that except in the event of a settlement of a settlement agreement, this coverage shall be reduced by workers' compensation, disability benefits, or similar law. So it's clearly conditional, and I think that's the most important feature of the case that this panel has before them this morning. The problem with the conditional element of that policy language is the manner in which American Economy has conducted itself in light of that conditional policy provision. Because everything that American Economy has done with respect to that condition is to try to avoid that condition. And we know that like all insurers, they have a duty of good faith, they have a duty of fair dealing with their insured, and so how can they attempt to avoid a settlement agreement in compliance with that duty that's imposed upon them? So that's been the rub throughout the case. There's an agreement, it's articulated that there was approval given for a settlement. That's correct, Your Honor. Justice Simon, that's been our position from the start. The way this policy is set up, there's three provisions in there. You've got tentative settlement agreement, you've got settlement agreement, and then you've got in the event of a settlement agreement. And when you read those three policy provisions together, they show one thing to the average Joe on the street, and that's me reading this policy. And that's that the purpose of those three provisions is to set up what the underinsured motorist proceeds set off will be against the policy limits. And that's the only thing that makes sense. Now, even if you don't adopt that position and Wait, wait, wait. One second. Yeah, but then there's the other clause that if in the event that there is no settlement, there's a different question regarding the allocation of proceeds. Well, I don't think so, Your Honor. What the provision says is except in the event of a settlement agreement, we shall have a worker's comp set off. But the big one is the uninsured motorist portion, and that's dealt with, the way I read this, it's dealt with as a separate The uninsured motorist provision? Yes, but there's workman's comp set off. There was one other set off. The underinsured motorist contribution, that was the other set off. And it clearly says in the event of a settlement agreement, the set off shall be the underinsured motorist's contribution. That's all they get. Now, American Economy wanted the trial court, now of course they're standing before you, asking you to read into that extra language. They want you to read that in the event of a settlement agreement, the set off shall be the underinsured motorist's proceeds, worker's comp benefits, pension benefits, disability benefits. We can't do that. The average Joe on the street isn't going to read the policy that way. They're going to read it according to the literal language. So that's been the problem from the start. So the party argument would then mean, Mr. Croson, that the agreement mentioned, the 2-2 agreement, your argument is that that means the agreement between the tortfeasor and the client. Would that be right? Or could it mean the insured and the insurer? It would be between the, so settlement agreement is defined in the policy as being the agreement between the insured and the insurer that, first of all, there's an underinsured motorist. Second of all, that he's liable in tort for damages. And then, without arbitration, agree as to what those damages are. So what that's doing is that's setting up the underinsured set off, because the damages in that clause refer back to the antecedent clause, where it talks about the damages from the underinsured motorist. So, but even if you don't look at it that way, even if you look at the position that's been urged by the insurer in this case, they've tried to claim that the reason there's no of all these various interpretations. Okay? I don't care what interpretation you give American economy. On behalf of Father Greeley, I'm going to agree to it. Okay? If you tell me that it's global damage and you claim it's 7 million, I'm fine with that. That still exceeds the policy limits here. If you tell me that it's damages that he's legally entitled to recover. When you look through their briefs and their arguments here, they've come up they've basically established a moving target for what they claim damages constitutes. I don't care. I'll hit any of those targets. I'll accept any of them, because under any of those targets, Father Greeley is still entitled to the entire policy proceeds, because all of them far exceed what the policy limit here. It's only a million dollar policy limit. Back when he had $900,000 in benefits that had been paid, and most of those were for medical, but some of them were for temporary total disability, which in a true damage scheme would equate to lost wages, because he was employed at the time. He was receiving money from the Sun Times. He was still writing books. There was a book that came out after he was at the time. Justice Quinn, I'm sorry. You point out in your brief that Father Greeley had received $911,000 in workers' comp benefits from American Economy. Is that right? It's not American Economy. It's a subsidiary. They're owned. Both of these companies are owned by the same people. I found that out when I got on the telephone one day. They told me, hey, we've got your letter demanding underinsured motorist coverage, and you want to pay? We're not going to pay because our subsidiary has paid out all this money in workers' comp proceeds. This is after we had been going along for a year, and I had advised them well in advance. We knew from the beginning he's got traumatic brain injury. This gentleman is never going to be the same. The damages in this case are extreme, and so that was the first time I had heard that the workers' comp carrier was the same one, and that they were alleging that they had a workers' comp set off in the case. That's the first time we were ever advised of that. So when you look at the policy provisions and you take them together, it's clear the purpose of those policy provisions is to set the underinsureds set off, and that's clear. We agreed to that, and so under that analysis, then certainly American Economy's got a duty to pay the policy proceeds. Just very briefly on the issue of jurisdiction that's been raised by the employee here. First of all, there's no 304 language at any time in this matter. The first time the trial court states that he has a final order is on the October 20th proceeding. It had been brought up the month previous at the September 16th proceeding that although he had ruled on the motion for summary judgment, he had never addressed the breach of contract claim, and the problem with the trial court's ultimate dismissal at the breach of contract claim is I'm submitting to this panel that that was improvidently done. You had a primary breach of contract when American Economy failed to acknowledge Father Greeley as a named insured. They did that in the face of and despite their own internal documents which showed that he was a named insured, despite the fact that the policy refers to him as being a priest, a sociologist, and an author. We know corporations aren't priests, they're not sociologists, they're not authors. So everything showed that he was a named insured, and so then under the Goldstein v. Lustig case, once you have that primary breach, they cannot avail themselves of the claim that they've got a set-off in another provision. So and it's also, there's a Dubay case which holds the same thing. So in light of those things, I'm submitting to this court that the trial court should not have dismissed the breach of contract claim. The breach of contract counterclaim was pending at all times. It was valid, and so for that reason, jurisdiction is properly vested in this court because the first time that all issues were resolved one way or the other was at that October 20th hearing. And if this panel has no further questions, I do want to Do you want to speak to the Section 155 sanctions denial? I will, yes. I think it's pretty clear on its face. I already talked about the fact that you have the primary breach where despite their own internal documents, despite those he's not a named insured. They then disclose those documents in discovery, and they're clear on their face there's at least eight references to Father Greeley being named as an individual. So that's clearly a bad faith activity on their part, at least, at least at the point where they continue thereafter and up to arguments here on appeal saying that he's not a named insured because it just I don't see that there's any other conclusion that the trial and the trial court correctly found that he was a named insured. And now in addition to that, we have the problem where the way the policy is set up under these facts, what American economy has to try to do is they have to do everything within their power, and that's what they've done, to try to avoid a settlement agreement as defined by that policy. That's in violation of their duty of good faith and fair dealing. Section 155 damages. That's in violation of public policy as applied under the actions that they've taken in this case. So again, Section 155 damages. Okay. We'll have five minutes for rebuttals. All right. Thank you. Thank you. Good morning. May it please the Court, Josh Vinson again on behalf of the Defendant Appellee American Economy Insurance. I do think we have a very substantial jurisdictional problem in the case. You know, at the time, Judge Martin ruled on July 20th and found that American really had recovered the $900,000 plus from workers' comp and the $250,000 from the tort feasors. And sure, that clearly exceeded the $1 million limits. And at that point, Judge Martin even recognized right away that there was nothing left to decide in the case. And once he made that determination that the setoff could be applied, there was nothing to be recovered under the UIM provision of the policy. And he noted that on the record. There was a fairly recent case, I think Justice Gordon wrote it, called American Country Insurance which dealt with this identical problem where you have, and this is like a bar exam question on finality and post-trial motion practice, but it was an identical circumstance where, and you see this all the time in the declaratory judgment actions, you'll see that one party will file a claim for declaratory relief and the other party, typically the insured, will file a counterclaim for breach of contract and bad faith under Section 155. And then the judge makes a ruling on cross motions for summary judgment that doesn't address all of the pending counts in these claim and cross claims. And in the American Country case, the court adopted what I think for lack of a better term is sort of a mirror image rule where when you have a counterclaim or a complaint and a counterclaim that put in there, the complaint and the counterclaim put into question the identical question of is he entitled to get any UIM benefits under this contract. Once Judge Martin ruled that American economy was entitled to the setoff, there couldn't be any breach of contract. There couldn't be any prejudgment interest. There couldn't be any bad faith. And so that was a case dispositive decision. And that occurred on July 20th. Now what happens after that is Father Greeley files a timely post-judgment motion. It's I think the fact that it's filed within 30 days of the July 20th ruling is recognition of the fact that it was probably a final judgment, as the judge had indicated at the time he ruled. There was no need for a 304A finding. That would have been superfluous. The judgment was final. There was nothing left for the court to do. That's the hallmark of a final judgment. So you have a post-judgment motion that's filed on August 18th. And then the judge, you look at that motion and it's attacking the ruling about the setoff. So it's a proper post-judgment motion. It holds the time for appeal. And then you have a decision on that motion on September 16th. And at that time, Judge Martin denies it. Now at that point, the case is done. There's nothing left to do. There was no modification of the prior ruling. The motion to reconsider was denied. And when that occurs, our case law is pretty clear that you either give up or you appeal. Those are your only two options. Well, there was no appeal filed within 30 days of the September 16th order that denied Father Greeley's motion to reconsider. No appeal at that point. Instead, what occurred is there was a little dispute that erupted between the parties about whether or not Father Greeley's counterclaim for breach of contract was still alive. And Judge Martin did call for additional briefs on that. That's kind of the unusual twist in this case, is that the judge did call for additional briefs. And so the parties filed additional briefs. And Father Greeley's brief, when you look at the substance of it, is a improper successive post-judgment motion. It is almost a duplicate of the prior motion to reconsider, attacking the judge's decision about the set-off. So it is an improper successive post-judgment motion. It's ineffective. The law is clear that the Circuit Court judge does not have the authority to allow a successive post-judgment motion. And American Economy took the position that the court was lacking jurisdiction, that the July 20th order had been final, that the September 16th ruling denying the motion to reconsider was the end of the case. We did argue in the alternative, in opposition to it, because you never know how those things are going to go. But we did take the position very clearly that the earlier orders were final and the court had lost jurisdiction. It appears that, when I'm looking at it, it says October 20th, 2011, the trial court dismissed the counterclaim for breach of contract as moot. And on October 20th, 2011, the order stated all claims have hereby, thereby been disposed of, and the order was made final and appealable, and that Father Greeley filed his appeal within 30 days. That is correct. But I don't believe that Judge Martin had any authority or jurisdiction to enter the October 20th order at that point. He had lost jurisdiction already. There was no proper post-judgment motion before him that would have extended the jurisdiction out to October 20th. But he asked for a briefing on it, right? He did ask for a briefing on it. And that's, you know, this raises a So why would we stiff him? Well, you know, there's a jurisprudential concern here about the finality of judgments. And I think, you know, the case law talks about the fact that the importance of the finality of a judgment. Could you preserve that? You've got, this is the trial court on September 16th, 2011. Trial court denied Father Greeley's motion. Trial court entered and continued all remaining issues and ordered the parties to file a memorandum on the issue. Instead, you, why didn't you object then? Well, we did. There are objections on the record as to that, Judge. When you read the transcript. You went through the briefing and the Well, but in the briefing And the court then made a substantive dispositive ruling. But in the briefing, we did indicate that we felt that he had lost jurisdiction. But he still had loose ends to wrap up. There were still issues that hadn't been closed. No, he determined it was moot. And it was moot. I mean, it's either moot or it's not moot. Well, that's an issue. What's that? That's an issue that's remaining. Well Why don't you go to the substance of the argument? Okay. I do, I would urge the court in considering this issue, that there is a significant public policy question there about whether a judge can unilaterally extend the jurisdiction when, under those circumstances, a final judgment has been entered. Certainly, a court retains jurisdiction to enforce its judgments. We know that. More than 30 days. But cannot extend its own jurisdiction after a final judgment has been entered. Let me just make an observation. Both myself and Justice Simon have been on the Rules Committee for many, many, many years. And about five years ago, against Mike Lucifer's complaints, Rule 303 was changed. Now we have the federal rule where any time somebody files an appeal, it's okay. Right. And so in terms of public policy, I think our Supreme Court, you can impose what the public policy is. Whenever they're filed, they're okay. So why don't you get to your substance of argument? Okay. There's two other issues. One is the question of whether Father Greeley was insured under the policy at all. The policies that we're looking at here, it's really a package of four distinct insurance policies. There's a commercial general liability, a CGL policy. There's a marine, an inland marine policy. There is a property and casualty policy. And there is an auto, business auto policy. So there are four distinct policies here, all wrapped into what's called a commercial package. Each of those policies has its own specific declarations page that identifies who is the insured. And specifically here, since we're dealing with the underinsured motorist coverage, we're talking specifically about the business auto coverage form and the UIM endorsement. Now, both of those documents have a place on them where they identify who is the named insured. And the only named insured that is identified on the policy is the corporation. His personal name is on the declaration page. His personal name appears across from where the mailing address is. It says named insured and mailing address. And that's the only place where his individual name does appear. And it's mentioned elsewhere in the policy as well. It's not mentioned, his individual name is not mentioned anywhere elsewhere in the policy. That's incorrect, Judge. There are some underwriting materials that counsel has included in the record from prior year policies about five years earlier where you do see Father Greeley mentioned individually. And in that instance, yes, he is mentioned as an individual. But that's not part of the declaration. So the bodily injury language in the policy would never have any attribution to Andrew Greeley individually? No. The corporation can't have bodily injury? No, but a member of it can. And the policy does provide coverage in certain instances for officers and employees of the company, sure. But in this case, in order to qualify for the UIM coverage, it says that he, as an officer of the company, would have to be occupying a covered auto. And he was not occupying a covered auto. He was occupying a taxi. And that's why he didn't qualify for UIM coverage as an insured person under this policy. And the CGL wouldn't be followed? The CGL has nothing to do with it. I mean, that's a completely separate policy. That's the portion that Mr. Cronson was referring to that talks about where his business happens to be as a sociologist, a priest, and an author. That's in the CGL policy. That's not in the business auto policy. There'd be no reason to identify what his occupation is in the business auto policy. And taking that as all true, why shouldn't we follow Pethin v. the State of Gobin, which is a court, an appellate court, held that just having somebody's name, so it says Freedom Heating, Gary Whitlock slash Frank Gobin, and an address, Frank Gobin's son was found to be covered under that declaration page. In that particular case, it was not a corporation. It was a partnership. And the court specifically found in that case that because it was a partnership and not a corporation, it wasn't subject to those limitations in terms of having to be an officer or employee of the corporation. It was sufficient that because it was a partnership, that the individual was covered as a person because the partnership didn't have an existence apart from the individual partners. And it was one of the partners' children who was. And it does provide coverage for insured's family member. Let me go back to this. I'm talking about the CGL now. It said, quote, named insured and mailing address. And the name insured shows Andrew M. Greeley Enterprises and Andrew M. Greeley. So then it says in the CGL, who is an insured? And it states, if you are designated in the declaration as an individual, you and your spouse are insureds. An organization other than a partnership joint venture or a limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties and your officers and directors. And it describes him, Mr. Greeley, as a priest and author and a sociologist. So it carves him out as an individual. And then it says the CGL policy also contains an underinsured motorist endorsement, a UIM endorsement. And in the UIM endorsement, it says, who is an insured? And it states, if the name insured is designated in the declaration as I, then an individual, then the following are insureds. The name insured and any family members. So how is it that we're misreading the language of the policy if you would not be an insured under both of these policies? I'm not sure which page you're looking at, Judge. And I don't have the record in front of me, but I can. The record references COO204, COO215, COO205 if you want to take a look. Okay. I mean, my first response is that the CGL policy is a comprehensive general liability policy. The UIM endorsement is a part of the business auto form. And the UIM endorsement itself identifies specifically who is the named insured. But he is on both. And as you said, it's a package. He bought a full package from you. You gave him everything. If he would have walked out of the agent's office after buying this, wouldn't he have the impression that he was insured under all of these policies? He was. No question about it. And I'm not arguing with you about that. But we're talking specifically about the business auto coverage and the UIM endorsement. And there is a UIM endorsement in there that identifies who the named insured is. And his name doesn't appear anywhere on it. And when you look at the renewal declarations where you see his name appear individually, it says that there are other declarations attached to this policy that modify and provide the particular coverage. So it does incorporate specifically the other endorsements and the other declarations for the business auto coverage and the UIM endorsement. And so you have to refer specifically to the specific policy under which he's claiming coverage. And under the business auto coverage, which is what provides the UIM and the UIM endorsement, the only person identified as a named insured is the corporation, not the individual. His individual name does not appear anywhere on those. And that's the coverage that he's seeking. But if what I'm assuming you're reading is the renewal declarations page, which mentions all of the policies that are there, it specifically refers you to look at the other declarations and endorsements that apply to those specifics. Is it by reference? Yes, it incorporates. So then why isn't it effective? Well, the ones that are effective are the ones that it says specifically control your coverage, which are the individual endorsements and business auto forms that identify who is a named insured. Right. I don't see the same disconnect. Okay. There's a third issue. Well, before you get to that, I'm interested in knowing, let me hear your side of the story on the razzle-dazzle they got in identifying the named insured on the 155 fees. Well, I'm not sure what you mean by the razzle-dazzle, Judge. It's no different than Speak to the issue. I'm not sure what you mean. Well, there's a claim here that there was a substantial period of time that took place where there was a denial of coverage individually that they wouldn't recognize. No, that's not accurate. The time sequence, the way the time sequence went down was that they first notified American Economy that they thought there was a potential for a UIM claim, but they didn't notify American Economy about the fact that the tortfeasor had made a settlement offer until January, I believe it's either 2010 or 2011. I forget the date. I do have it here, actually. Just one second. January 22nd of 2010 is when Father Greeley's attorney notifies American Economy that they have received a $250,000 settlement offer from the tortfeasor. Under the underinsured motorist statute, that's part of the process that's required. They have to first tell the insurer, here's what has been offered. Now that triggers under the statute the opportunity for the insurer to indicate whether they're going to advance that money and then figure out how much more he may be entitled to or not. And the insurer only has 30 days within which to do that sort of thing. And so what you then see is he then makes the specific request about the okay to accept that money on February 19th and by March 9th is the denial letter. So we're talking all within a period of from the end of January to March 9th, which is, I don't know, barely about 40 days, is from the time when notification of the offer from the tortfeasor's insurer is given until the denial letter is issued. So there wasn't any substantial delay here. Did AEI or any of its affiliates issue a reservation of rights letter? No. There's no occasion to issue a reservation of rights letter because that typically occurs in the context where somebody is asking for a defense to a lawsuit and there's a question as to whether you owe coverage for the defense of the lawsuit. And in this case, you know, it's either we're going to accept coverage or we're not going to accept coverage for what they call a first-party claim. Reservation of rights typically come up with third-party claims, claims by a third-party against the insured where there's a question of coverage. But for a first-party claim where you're just seeking your own benefits under the insurance policy, typically it's just going to be either an acceptance or denial of the claim. You have five more minutes, sir. The third issue that exists in this case is the question of whether there was ever a settlement between American Economy and Father Greeley because that's the only way he can avoid the set-off for the workers' compensation benefits. There's always a set-off for the tortfeasor, the amount paid by the tortfeasor. So the real question here is whether there was American Economy was entitled to the set-off for the payment of the workers' compensation benefits. The only way he avoids the set-off is if he can show that he and American Economy entered into an agreement as to the tortfeasor's liability and the amount of his damages that he had sustained. And there's no agreement like that in this case anywhere. There's simply a denial of coverage. The denial of coverage letter says, basically, if you want to go ahead and settle with the tortfeasor, you're free to do so. But that's a settlement between him and the tortfeasor. That's not a settlement between American Economy and Father Greeley. And you have to ask yourself, well, if he contends there was a settlement between the insurance company and himself, what was the term of that settlement? If the agreement of damages, because that's really what he's going on. He's trying to say that we agreed on damages. If we agreed that the damages were $250,000, the amount of the tortfeasor's still has no underinsured voters claim. Because it's only if the settlement amount that we've agreed to would exceed the amount that he's received from the tortfeasor that there would be any UIM claim. So if he's saying that the settlement was our saying, okay, you can go ahead and take the money from the tortfeasor, the $200,000, and we agree that's $250,000, that's your damages, well, then he has no UIM claim. So there would have to be, by definition, an agreement on an amount of damages that he suffered in excess of the $250,000. And there's nothing. All we have, the only thing we have and the only thing he points to is a letter dated March 9th of 2010, which says we deny your claim. We're not going to pay you any UIM benefits, and we are going to claim this. Even if we did, we would claim the set-off for all the workers' compensation benefits that you've received. So there can't possibly be a settlement in this case. And that's specifically what Judge Martin found dispositive. That was where the case ended, was on that decision. And that decision was eminently correct. There was no settlement agreement. You can't construct a settlement agreement anywhere out of the documents in this record. All there is is a denial of coverage letter. How can there be a settlement on the UIM benefits if they denied that he was entitled to any coverage? How could he claim vexatious and unreasonable delay for a claim that we denied outright? How can he claim that if he can't have it both ways? You can't say there was a settlement between the parties and that we were vexatious and unreasonable. He's basing the fact that we're vexatious and unreasonable because we refused to settle with him. So there can't be a settlement in this case. And that's what Judge Martin found. And so if there is no settlement in the case, no settlement agreement, then we're entitled to the set-off, as Judge Martin found, and there's no UIM benefits to be recovered here. The man has received over a million dollars in benefits already from other sources. It exceeds the amount of the UIM coverage. So there's no claim to be made here at the end of the day. The insurance policies are to be given de novo review exclusively to the court and to make a determination under the four corners of those instruments? Yes. If the court doesn't have any further questions, we would ask that you affirm the judgment. Thank you, sir.  Five minutes. If I could just make a couple of points. The counsel is focused on arguing before Your Honors that there's no settlement agreement. And he's doing that in a colloquial sense. You can't interpret this in a colloquial sense. It has to be whether or not it meets the definition agreement under the policy provision. And to allow them to argue that because in a colloquial sense we are not coming to a settlement agreement is to allow them to frustrate the policy because the policy says that they can't get a set-off in the event that there's a settlement agreement. So that's why they're making that argument. But that argument cannot be made because it And one of our claims before the trial court was we can make out in our breach of contract claim a settlement agreement under the policy provisions because all that's required to have a settlement agreement under the policy provisions is an agreement that you've got or you don't even need the agreement, but the facts make the settlement agreement under the policy provisions. Do you have a tort fees? Who's liable in tort? Is he liable for damages? And what are those damages? And in this case it was his policy limits. So that was our position throughout. Now the fact that the trial court didn't accept that doesn't mean that this panel cannot accept that and find that that's the appropriate understanding of settlement agreement under the policy language. And that's what's important is what does the policy say, not what does the guy on the street think settlement agreement means. There were evidently up to six different times on interpreting the term damages in terms of the colloquy between counsel or their representatives. And that's correct. And the reason that they did that was because they didn't want to have a finding that we've got a settlement agreement. And so what they did was they said, well, the only thing we can pick here is damages. Because clearly we've got a tort fees or he's offered up his damages. So what we're going to claim is the damages in that settlement agreement provision, they don't refer back to the tort fees or damages. They refer to, okay, first we're going to say this. Now we're going to say this. Now we're going to say that. And irrespective of that, I've always said, we'll agree to those. Let's get together and agree to those, okay? Because let's say the damages are global. I mean, we could come up with a pretty good figure, I think. Both sides could. So we'll agree, whatever they are, they're going to be in excess of the million dollars of policy coverage that they have. So that's the problem with the position that they've adopted here. And they've done it throughout. And they've consistently argued things such as, well, we're not going to enter into a settlement agreement with you because you don't want to agree to a setoff. And we workers' compensation, despite the fact that that's the absolute reverse of what the policy says. It's contrary to logic. But nonetheless, they've continued to do this. Was there a $250,000 setoff against the million dollar UIM? That's what they have here, according to their policy, because what their policy says is, you know, in the event of a settlement agreement, they get the setoff from the underinsured motorist proceeds. So you're arguing that the setoffs would have been made in conformance with the policy, to comply with the policy? Once either a judge finds that a settlement agreement exists on the facts, which I think this court or the trial court would be empowered to do, they could say, on these facts, we've got a settlement agreement as defined by this policy. Therefore, you look to the language in the policy that says, in the event of the settlement agreement, that's what they get. They get the setoff for the underinsured motorist proceeds. But they don't get a setoff for workers' comp. It's not in there, and you can't read it in there. If there were pension benefits, they wouldn't get the setoff for that. It's not in there, and you can't read it in there. If there were disability benefits, it's not in there, and you can't read it in there. That's what they suggested should be done, and they continue to suggest that that's the way it should be approached. It's contrary to logic. It's contrary to common policy construction. So based on all those things, unless the court – oh, I did want to – I can't remember if it was Justice Harris or – Simon asked – it was Justice Harris. At what point did we first put them on notice that we had a substantial underinsured motorist claim? You we told them we've got the policy limits offer per state statute from the cab company. I notified them in July of 2009. They didn't respond until March of 2010, claiming, oh, by the way, you're not a named insured. So that's the time period that passed that you were asking about. Thank you. That's all. Thank you. Thanks to both counsels for excellent briefs and a very good oral argument. The matter is taken under advisement.